UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- x

MICHAEL J. WASSER,

                   Plaintiff,

     - against -                              <u>MEMORANDUM AND ORDER</u>

NEW YORK STATE OFFICE OF                    Civil Action No.
VOCATIONAL AND EDUCATIONAL                  CV-01-6788 (DGT)
SERVICES FOR INDIVIDUALS WITH
DISABILITIES; LAWRENCE GLOECKLER,
Deputy Commissioner New York State
Education Department, Office of
Vocational and Educational
Services for Individuals with
Disabilities, in his individual
and official capacities;
DANNA MITCHELL, Brooklyn Office
Manager, New York State Education
Department, Office of Vocational
and Educational Services for
Individuals with Disabilities, in
her official and individual
capacities,

                   Defendants.

------------------------------------------------------- x

Trager, J.:

       Plaintiff Michael J. Wasser ("Wasser") commenced this action

pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701 <u>et</u>

<u>seq.</u> (the "Rehabilitation Act")and 42 U.S.C. § 1983 ("§ 1983")

against the New York State Office of Vocational and Educational

Services for Individuals with Disabilities ("VESID"); Lawrence

Gloeckler ("Gloeckler"), the Deputy Commissioner of the New York

State Education Department, in his official and individual

capacities; and Danna Mitchell ("Mitchell"), VESID's Brooklyn

Office Manager, in her official and individual capacities. Wasser, a beneficiary of a federally-funded vocational rehabilitation services program administered by VESID, claims that defendants denied him various benefits and services to which he is entitled under Title I of the Rehabilitation Act. The parties are presumed to be familiar with the 2003 Memorandum and Order in this case. Wasser v. N.Y. State Office of Vocational and Educ. Serv. for Individuals with Disabilities, No. 01-CV-6788, 2003 U.S. Dist. LEXIS 17496 (E.D.N.Y. Sept. 30, 2003) ("Wasser I").

Wasser is seeking review of the decision issued on July 18, 2001 by hearing officer David Marasciullo ("Marasciullo"), which denied Wasser's claims and found that VESID had provided him with adequate services as required by state and federal law. Defendants are seeking dismissal of all claims remaining after Wasser I. For the reasons explained below, Wasser's remaining claims are dismissed.

### Background

### (1)

Wasser is 34 years old and suffers from muscular dystrophy, which has rendered him "functionally a quadriplegic." Compl. ¶ 8. He is dependent for all activities of daily living and uses a computerized motorized wheelchair. Id. Wasser became a VESID

client in 1992, and in collaboration with VESID staff he developed an Individualized Written Rehabilitation Program ("IWRP") that listed his career goal as "corporate lawyer."  <u>See</u> Wasser IWRP, attached as Ex. B to Affidavit of Frank Stechel in Support of Defendants' Supplemental Submission on Motion to Dismiss ("Stechel Aff."), at 62.  In furtherance of his IWRP, Wasser received counseling services and benefits from VESID, including adapted computer systems, transportation and tuition for his undergraduate education, and transportation and partial tuition at Brooklyn Law School.  <u>See</u> Record of Goods and Services Authorized and Vouchered for Payment by VESID on Behalf of Wasser, 1991-2001, attached as Stechel Aff. Ex. A.  From 1992 until VESID closed Wasser's case in March 2000, VESID spent approximately $132,000 on Wasser's vocational rehabilitation. Rehabilitation Closure Case Note (Mar. 17, 2000), submitted as Wasser Hearing Ex. 21.[1]

Wasser's relationship with VESID has been contentious from the start.  As a VESID client, Wasser has challenged VESID's provision of services on numerous occasions and initiated four separate agency hearings.  In 1993, while Wasser was a student at Brooklyn College, he initiated (and won) a hearing challenging

---

[1] Exhibits identified as "Wasser Hearing Ex." and "H.O. Ex." were submitted by Wasser and the hearing officer during the administrative hearing sessions, and are attached as an appendix to the hearing transcript.

VESID's refusal to provide him with a desktop computer equipped with speech-recognition software. Declaration of Michael Wasser, dated Jun. 7, 2006 ("Wasser Decl.") at ¶¶ 37-41. The hearing officer reversed the agency's decision, finding the VESID technology expert and the VESID evaluator to be "evasive and not credible." Id. ¶ 40. Despite the finding in his favor, Wasser did not receive the requested technology until the spring of 1995. Id. Wasser contends that after this hearing, "the entire VESID agency began to act vindictively and abusively towards [him]." Compl. ¶ 10.

In 1997, after graduating from Brooklyn College and just prior to commencing his studies at Brooklyn Law School, Wasser sought assistance from VESID in acquiring a laptop computer and accessible writing surfaces. Wasser contends that he wanted to create "an environment of cooperation with VESID," in order to allow him to be "ready to compete with [his] peers in law school." Wasser Decl. ¶ 42. VESID denied this request, explaining that he had succeeded at Brooklyn College without a laptop and that Brooklyn Law School was responsible for providing the tables. Id. Wasser initiated a fair hearing to challenge that decision. After the first session, Wasser also requested that Defendant Danna Mitchell be removed as his caseworker and that Defendant Lawrence Gloeckler remove the presiding hearing officer, claiming the officer was "derelict in [] carrying out

his responsibilities and ultimately failed to allow for an objective or open airing of [Wasser's] position." Wasser Decl. ¶ 50. VESID's Client Assistance Program also requested that the hearing officer be removed and stated that Defendant Mitchell "harbors a considerable animosity towards the Wassers [which] . . . represents a substantive barrier to [his] access to VESID's services." Id. As noted in the 2003 Order, Wasser also alleged that the hearing officer and VESID representatives engaged in misconduct during the hearing process. Wasser I at *7. Though Gloeckler refused to remove the hearing officer or reassign Wasser's case, the dispute was ultimately settled and Wasser was provided with the requested equipment. Wasser Decl. ¶¶ 50-51, 53.

Later in 1997, Wasser requested a second fair hearing to challenge VESID's failure to provide ambulette transportation and fees for summer courses at Brooklyn Law School. Wasser Decl. ¶ 56. VESID denied the request on the grounds that Wasser did not meet VESID's summer school guidelines.[2] Letter from Thomas

---

[2] VESID Policy 405.00 ("Training at a College or a University Leading to a Degree"), attached as Wasser Decl. Ex. 45, states that VESID will sponsor summer courses only:
> To advance the date to complete a program; or
> To enable a consumer to take required or sequential courses which would not be available at any other time; or
> To enable a consumer to retake a course failed during the semester which is required to meet the completion target date on the vocational plan; or
> To meet the needs of a consumer whose disability restricts the number of credits to be undertaken per semester.

J. Couto to M. Wasser (May 27, 1997), attached as Wasser Decl. Ex. 45. On May 27, 1997 the hearing officer upheld VESID's decision. Wasser Decl. ¶ 59. In the summer of 1998, Wasser again requested that VESID sponsor the cost of summer courses, and VESID again denied the request.

Wasser graduated from Brooklyn Law School in 1999, and he sat for and passed the New York State bar examination in July of that year. Wasser I at *9. Prior to commencing his career at the New York City Law Department as an Assistant Corporation Counsel in September 1999, Wasser notified VESID in a one-sentence letter that he had secured employment. Letter from M. Wasser to Danna Mitchell (Sept. 9, 1999), attached as Stechel Aff. Ex. C.[3] After receiving notification from Wasser that he had secured employment, Mitchell sent Wasser a letter congratulating him on his success. Mitchell also requested that Wasser provide details about his job, and invited Wasser to notify VESID should he encounter any problems in the course of his employment with which VESID could be of assistance. Letter from Danna Mitchell to M. Wasser (Sept. 20, 1999), attached as Stechel Aff. Ex. D. Wasser only responded to VESID's request for information after a second letter was sent. See Letter from Danna Mitchell to M. Wasser (Oct. 28, 1999), attached as Stechel

---

[3] The letter reads in full: "Dear Ms. Mitchell, This letter is to inform you that I have secured employment. Sincerely, Michael Wasser"

Aff. Ex. E.  In his reply to VESID's request for information, Wasser stated: "I do not give you, nor anyone from VESID permission to contact my employer, or any representative of my employer, under any circumstances.  You have proved yourself untrustworthy and dishonest."  Letter from M. Wasser to Danna Mitchell (Jan. 5, 2000), submitted as Wasser Hearing Ex. 1.  In this same letter, Wasser requested information about transitional and other services available to him, as well as a back-up motorized wheelchair and a van modified for a driver or passenger pending the outcome of his driver evaluation.  Id.

VESID closed Wasser's case on March 17, 2000 because, according to VESID, he had achieved his vocational objective and had been successfully employed for over ninety days.  See Letter from Danna Mitchell to M. Wasser (Mar. 17, 2000) ["Closure Letter"], submitted as Wasser Hearing Ex. 3.  Although VESID acknowledged during the hearing that it normally speaks with a client before closing a case, VESID did not discuss closure with Wasser because doing so was not required under VESID policy and because it had obtained the requisite information for case closure without such a meeting.  Jan. 8, 2001 Tr. at 93:21-98:20; see also Rehabilitation Closure Case Note (Mar. 17, 2000), submitted as Wasser Hearing Ex. 21.  In addition, Danna Mitchell noted in Wasser's Rehabilitation Closure Case Note that she was

reluctant to inform Wasser of the decision to close his case in advance because

> experience tells us that the family will respond with
> their usual verbal abuse.  I am really reluctant to
> invite that by giving advance notice of closure . . . .
> [H]e has always made it clear that he did not value and
> did not want anything resembling a counseling
> relationship with VESID staff.  VESID has provided
> funds for his undergraduate degree at Brooklyn College,
> his law degree at Brooklyn Law School, Special
> Transportation, several evaluations, a very
> comprehensive computer system for his home and a laptop
> for law school, major home modifications and furniture
> for their home, as well as a significant assortment of
> other items.  In spite of that, Michael and his family
> still do not believe that VESID has served him
> adequately.

Rehabilitation Case Closure Note (Mar. 17, 2000), submitted as Wasser Hearing Ex. 21.

As a consequence of the closure of Wasser's vocational services case, his driving evaluation was cancelled.  In the letter informing Wasser that his case had been closed, VESID noted that an evaluation to determine his potential driving capabilities, as well as any other services Wasser might require, could still be arranged through VESID's Post Employment Services and that if his needs were extensive his case could be reopened.  See Closure Letter; see also Letter from Danna Mitchell to Kessler Institute for Rehabilitation, Driver Rehabilitation Program (Mar. 17, 2000), submitted as Wasser Hearing Ex. 12.  The letter also directed Wasser to several resources that would answer the questions he posed in his January 5, 2000 letter, and

informed Wasser of his right to request a review of the decision through mediation or an impartial hearing.  <u>See</u> Closure Letter.

On May 20, 2000 Wasser requested that VESID reopen his case because, in his opinion, he had not completed his rehabilitation and because he still had several rehabilitative service requests pending.  Letter from M. Wasser to Danna Mitchell (May 20, 2000), attached as Wasser Decl. Ex. 68.  On June 8, 2000 Mitchell responded to Wasser's request by reminding him that a driver evaluation was still available through Post Employment Services and providing him information on how to complete that process. Mitchell told Wasser that his case could be reopened if necessary, pending the outcome of the driver evaluation, or if he chose to submit a new application for services.  Letter from Danna Mitchell to M. Wasser (Jun. 8, 2000), attached as Wasser Decl. Ex. 70.

On June 8, 2000 Wasser again wrote to VESID - having not yet received Mitchell's letter dated the same day - requesting an administrative review to reopen his case and reinstate the driver evaluation.  Wasser also asked VESID to pay for driver training, a modified van pending the outcome of the driver evaluation, full tuition reimbursement for tuition at Brooklyn Law School, reimbursement for his internship during the summer of 1998, a back-up motorized wheelchair, and reimbursement for "outstanding expenses" incurred prior to case closure.  <u>See</u> Letter from M.

Wasser to Danna Mitchell (Jun. 8, 2000), attached as Wasser Decl. Ex. 69.

Mitchell responded to Wasser's June 8, 2000 request for an Administrative Review, acknowledging that their correspondence had likely crossed in the mail. In her response, Mitchell stated that she was "interested in yielding up the adversarial relationship between [them]," suggested that mediation might be an effective and productive alternative to Administrative Review if Wasser were "genuinely interested in establishing a counseling relationship," and expressed hope that Wasser would "give serious thought to relinquishing the antagonism between [them] and moving forward in a more constructive way." Letter from Danna Mitchell to M. Wasser (Jun. 13, 2000), attached as Wasser Decl. Ex. 71. Mitchell followed up with Wasser several weeks later, again suggesting that mediation could be a productive alternative but offering to schedule an Administrative Review if Wasser was more comfortable with that option. Letter from Danna Mitchell to M. Wasser (Jun. 29, 2000), attached as Wasser Decl. Ex. 72.

Wasser responded to Mitchell's letters dated June 8, 2000, June 13, 2000 and June 29, 2000 acknowledging her offer to reestablish a counseling relationship. Rather than accept this offer, however, Wasser reiterated his request for rescission of case closure as well as other services, and stated that he wanted to proceed to an Administrative Review if VESID was unwilling to

reopen his case. Letter from M. Wasser to Danna Mitchell (July 4, 2000), attached as Wasser Decl. Ex. 73. Mitchell expressed disappointment at Wasser's decision not "to proceed in a more forward-looking manner, or even to consider mediation," and scheduled an Administrative Review for July 20, 2001. Letter from Danna Mitchell to M. Wasser (July 10, 2000), attached as Wasser Decl. Ex. 74. The letter again reminded Wasser that VESID was willing to do a driver evaluation through Post Employment Services, and provided Wasser information about the Administrative Review process and the necessary documents he should bring. Id. Further, Mitchell informed Wasser that if the scheduled date was inconvenient for him that it could be rescheduled. Id.

Wasser responded with a letter in which he stated that he was "certain that [VESID's] plan was to prematurely close [his] case without notice and without meeting with [him]," and that Danna Mitchell was "an expert in manipulation, stalling, delaying tactics and misrepresenting VESID policy." Letter from M. Wasser to Danna Mitchell (Aug. 6, 2000), attached as Wasser Decl. Ex. 75. Wasser further asserted that VESID had an obligation to provide transportation even to individuals who are employed, contrary to VESID's articulation of its own policy. Id. Finally, Wasser requested that his Administrative Review be scheduled on a Friday, and that VESID "notify the person selected

to preside over this administrative review of [Wasser's] scheduling needs." Id.

On August 21, 2000, in light of Wasser's demand that somebody other than Mitchell review his case, VESID declined to pursue an Administrative Review, citing VESID Policy Handbook § 105.00, which according to VESID "allows a District Office Manager to decline to do an Administrative Review." Letter from Danna Mitchell to M. Wasser (Aug. 21, 2000), attached as Wasser Decl. Ex. 76. Mitchell notified Wasser that he had several options moving forward: he could 1) reapply for VESID services and have his case reopened; 2) submit his requests through Post Employment Services; 3) participate in mediation; or 4) proceed to an Impartial Hearing. Id.

On September 20, 2000 Wasser requested an impartial hearing. Letter from M. Wasser to Danna Mitchell (Sept. 20, 2000), submitted as H.O. Ex. 1. VESID duly responded to Wasser's request, appointing David Marasciullo to serve as the hearing officer and scheduling an impartial hearing to take place in November 2000. Letter from William A. Carpenter to M. Wasser (Sept. 29, 2000), submitted as H.O. Ex. 2. Some correspondence between Wasser and VESID ensued regarding what Wasser perceived as a discrepancy between the issues he requested to be discussed at the hearing and those which VESID enumerated in its initial letter scheduling the hearing, but this discrepancy was

ultimately resolved to Wasser's satisfaction.  Letter from M.
Wasser to William A. Carpenter (Oct. 17, 2000), submitted as H.O.
Ex. 3; Letter from William A. Carpenter to M. Wasser (Oct. 23,
2000), submitted as H.O. Ex. 4.  Wasser also requested that the
hearing scheduled for November be postponed until January 2001.
Letter from M. Wasser to David Marasciullo (Oct. 25, 2000),
submitted as H.O. Ex. 5.  That request was granted, and the
hearing was rescheduled for January 8, 2001.  VESID Notice of
Postponement (Oct. 27, 2000), submitted as H.O. Ex. 6.

On December 28, 2000, Wasser again requested that the
hearing be postponed so that he could obtain legal counsel and
because of a conflict with his work schedule.  Letter from M.
Wasser to David Marasciullo (Dec. 28, 2000), submitted as H.O.
Ex. 18.  That request was denied and the hearing commenced as
scheduled on January 8, 2001.

The hearing spanned four increasingly tense sessions over
the course of six months.  Wasser alleges that during the hearing
sessions, Marasciullo denied him the opportunity to make an
opening statement and acted with hostility toward him and his
family.  Compl. ¶ 24.  For example, Marasciullo told Wasser that
the opening remarks he had submitted in advance of the hearing
were "voluminous," and requested that Wasser make his points "as
briefly as possible."  Jan. 8, 2001 Tr. at 9:9-9:13.  Wasser
argued at the hearing that "stating it as briefly as possible

[would] not allow [him] to fully present all the facts and circumstances which [would] be necessary to make a decision." Id. at 9:14-9:17. In response, Marasciullo remarked that he had read the letter Wasser submitted with his opening remarks, and that it did not consist of facts but rather of "accusations, unfounded incriminations." Id. at 9:18-9:21. Nonetheless, Wasser was able to make an opening statement that outlined the basis for his complaints against the agency and the relief he sought. Id. at 11:13-12:21.

Wasser and Marasciullo also sparred over the scope of the hearing officer's authority under New York State Regulation 247.3, which outlines an individual's right to present evidence during a hearing. Id. at 10:3-11:12. Wasser maintained that the regulation permitted him to present "all relevant facts [and] advance any pertinent arguments without undue interference, . . . as determined by the hearing officer." Marasciullo, for his part, interpreted the regulation's qualifying language to allow him complete control over the direction of the hearing. Id. at 10:3-11:12.

The palpable acrimony of the hearing also extended to Wasser's parents, who accompanied him to the hearing sessions in order to serve as his "arms and legs." Id. at 21:22. Wasser required his parents' assistance for such things as retrieving documents and taking notes. However, their participation proved

disruptive. For example, Wasser's mother repeatedly asked for copies of documents being submitted into evidence by VESID, and subsequently questioned Danna Mitchell during her testimony. Id. at 15:24-16:8, 18:18-19:18, 22:7-25:8. Marasciullo finally chastised Mrs. Wasser, saying: "You have already interrupted counsel, now you are interrupting me. You can't interrupt me, all right." Id. at 16:7-16:8. Mrs. Wasser's multiple requests for information about the documents being entered into the record as evidence finally prompted Marasciullo to remind Mrs. Wasser that she "[was] not a part of his hearing . . . [Wasser] has a computer in front of him, let him write it down." Id. at 24:19. Wasser stated that he was unable to type quickly and that it would be faster for his mother to take notes for him. Id. at 25:18-25:19. Ultimately, Marasciullo "rule[d] this is nonsense" and ordered that the hearing proceed. Id. at 26:8. Despite the acerbic nature of the first hearing session, however, VESID repeatedly reiterated its willingness to provide a driver evaluation through Post Employment Services. See id. at 33:4-12; Mar. 21, 2001 Tr. at 102:16-103:5, 107:4-10:8, 134:6-19.

The hearing could not be completed during the first session, and a second hearing date was scheduled for March 5, 2001. On March 2, 2001, several days before the second hearing session was scheduled to take place, Wasser's mother requested that the hearing be postponed because her daughter living upstate

(Michael's sister) had a problem with her baby. Letter from E. Wasser to David Marasciullo (Mar. 2, 2001), submitted as H.O. Ex. 8. Marasciullo denied her request for a postponement. Then, on March 4, Wasser requested that the hearing be postponed due to a forecasted blizzard. Letter from M. Wasser to David Marasciullo (Mar. 4, 2001), submitted as H.O. Ex. 10. Marasciullo initially denied the request, but then on March 5, 2001 postponed the hearing until March 21, 2001. VESID Notice of Postponement (Mar. 5, 2001), submitted as H.O. Ex. 12.

Prior to the second hearing session scheduled for March 21, 2001 Wasser's father submitted a petition to have Marasciullo removed as hearing officer, alleging bias and incompetence. Letter from S. Wasser to Deputy Commissioner Lawrence Gloeckler (Mar. 14, 2001), submitted as H.O. Ex. 13. Gloeckler denied the petition and instructed that Marasciullo continue as the hearing officer. Letter from Deputy Commissioner Lawrence Gloeckler to M. Wasser (Mar. 20, 2001), submitted as H.O. Ex. 14.

The March 21, 2001 hearing proceeded as scheduled and quickly deteriorated into a dispute over what the Wassers perceived to be "a dangerous condition" involving a "severely shaking" table in the hearing room. Mar. 21, 2001 Tr. at 206:2-4. After much discussion regarding the condition of the table, Marasciullo adjourned the hearing session so that the table could be adjusted to Wasser's satisfaction. Id. at 211:10-20.

When the hearing finally reconvened, Marasciullo and Wasser engaged in a lengthy discussion as to the proper role of Wasser's parents during the hearing. Wasser asserted that his parents would "in certain circumstances, . . . act as co-counsel." Id. at 215:24-25. This prompted Marasciullo to ask Wasser a series of questions in order to determine the basis for Wasser's understanding of his parents' role. For example, Marasciullo asked whether Wasser's parents were attorneys or admitted to practice law in New York state. Id. at 216:2-18:10. Wasser was generally evasive, and Marasciullo concluded that Wasser's parents could not properly serve in that capacity. As such, Marasciullo directed them "to remain mute for the rest of this hearing." Id. at 218:7-10. In response, Wasser proclaimed: "You always seem to poison the record with accusing them of talking, accusing them of interrupting the hearing, which is absolutely untrue." Id. at 218:16-19.

In the course of the second hearing session, it was also revealed that Wasser had not yet completed a driver evaluation to determine his driving capabilities. Mar. 21, 2001 Tr. at 345:5-18. As such, at the conclusion of the session Marasciullo issued an interim decision directing Wasser to complete the driver evaluation, which was necessary to determine his needs and abilities with respect to transportation services, prior to the next scheduled hearing. Id. at 346:2-3; see also Letter from

David Marasciullo to M. Wasser (Mar. 22, 2001), submitted as H.O. Ex. 30. The interim decision also accused Wasser's mother of disrupting the proceedings with inappropriate behavior including "emotional outbursts" and "slanderous character assassinations," and she was barred from attending future hearings. Wasser asserts that Marasciullo's allegations against his mother are false. Wasser Decl. at ¶ 5.

There appears to have been considerable confusion on all sides with respect to the date of the third hearing session. In a letter dated April 11, 2001 Marasciullo erroneously advised Wasser and VESID that the third hearing session was scheduled for Monday, March 21, 2001. Marasciullo corrected this error in a letter dated May 7, 2001 in which he clarified the correct date for the third hearing, actually scheduled for Monday, May 21, 2001. See Letter from M. Wasser to David Marasciullo (May 22, 2001), submitted as H.O. Ex. 25. On May 11, Kenneth Pawson, the attorney representing VESID at the impartial hearing, requested that the May 21, 2001 hearing session be postponed. Letter from Kenneth Pawson to David Marasciullo (May 11, 2001), submitted as H.O. Ex. 23. That request was granted and the hearing was re-scheduled for June 5, 2001. Letter from David Marasciullo to M. Wasser (May 14, 2001), attached as Wasser Decl. ex. 54. However, this date posed a conflict for Wasser, and he requested that the hearing be postponed again. Letter from M. Wasser to David

18

Marasciullo (May 22, 2001), submitted as H.O. Ex. 25; see also
Letter from M. Wasser to David Marasciullo (May 31, 2001),
submitted as H.O. Ex. 27.  That request was denied, and the
hearing re-convened on June 5, 2001 as scheduled.  Letter from
David Marasciullo to M. Wasser (May 29, 2001), attached as Wasser
Decl. Ex. 56.

During the third hearing session, Wasser testified that he
was unable to complete the driver evaluation at Kessler Institute
pursuant to the interim order issued by Marasciullo at the
previous hearing session.  June 5, 2001 Tr. at 391:5-95:6.
Marasciullo repeatedly asked Wasser whether he called the Kessler
Institute, and if so, when those calls took place; Wasser
repeatedly answered that he did call, but that he was unable to
remember the date.  Id.  Finally, Marasciullo stated: "The record
now reflects that Mr. Wasser, Jr., and Mr. Wasser, Sr., are
completely out of control, unruly, disrespectful and are refusing
to cooperate with the hearing officer."  Id. at 396:10-14.  The
behavior that prompted Marasciullo's statement is unclear from
the record.  On the issue as to whether Wasser complied with the
interim order, Marasciullo requested that Wasser confirm the date
he called Kessler regarding the driver evaluation.  Id.  Wasser
was uncooperative and responded: "If you are interested, let
VESID find out.  I am not responsible for Kessler's record
keeping."  Id. at 396:24-97:2.

Later in the hearing, another dispute erupted between Marasciullo and Wasser regarding the force of VESID policy. Marasciullo stated that "VESID policy is federal law," and Wasser took issue with Marasciullo's conflation of federal law and VESID policy. Id. at 441:10-442:18. Marasciullo has alleged that after the hearing, Wasser's mother followed him into an elevator and shouted at him, "I know where you live. I'll get you. I have your address," and "You're a 75 year old man. You'd sell yourself for $500.00 a day." Wasser I at *16. Marasciullo barred Wasser's mother from entering the building where hearings took place until completing a psychiatric evaluation. Id.

A fourth hearing session was scheduled for July 18, 2001. On July 9, Wasser requested a postponement, citing medical necessity. Letter from M. Wasser to David Marasciullo (July 9, 2001), submitted as H.O. Ex. 35. On July 12, 2001 Marasciullo had not yet responded and Wasser reiterated his request for a postponement. Letter from M. Wasser to David Marasciullo (July 12, 2001), submitted as H.O. Ex. 34. Marasciullo ultimately denied Wasser's request, citing a failure to provide documentation of medical necessity. Letter from David Marasciullo to M. Wasser (July 13, 2001), submitted as H.O. Ex. 36. Wasser responded by letter to Deputy Commissioner Gloeckler, stating that he would be unable to attend the July 18, 2001 hearing and directing VESID to consider his letter to be

20

sufficient notice of his inability to appear. Letter from M.
Wasser to Deputy Commissioner Lawrence Gloeckler (July 17, 2001),
submitted as H.O. Ex. 33. Wasser did not provide a letter from
his physician documenting his medical necessity until July 24,
2001. See Letter from M. Wasser to David Marasciullo (July 24,
2001); Letter from Michel Dubois, M.D. (July 18, 2001), attached
as Wasser Decl. Ex. 49.

On July 18, 2001 the fourth hearing session commenced
without Wasser in attendance. See July 18, 2001 Tr. at 484:4.
Marasciullo held Wasser in default for failing to appear at the
final scheduled hearing. See Final Decision in the matter of an
appeal by Michael J. Wasser (July 27, 2001) ("Final Decision"),
attached as Ex. D to Affidavit of Michael Klekman in Support of
Defendants' Supplemental Submission on Motion to Dismiss
("Klekman Aff."). Despite holding Wasser in default,
Marasciullo, nevertheless, proceeded to rule on the merits. The
Final Decision, although brief, included a recitation of both
Wasser's and VESID's positions, as well as findings of fact and
the basis for Marasciullo's conclusions. Marasciullo's final
decision found that VESID provided Wasser with adequate services
as defined by state and federal law, that VESID's closure of
Wasser's case was proper, and that Wasser: (1) "did not establish
financial need within prescribed guidelines for financial
assistance with tuition, a summer internship program in 1998 and

21

the cost of the New York Bar Examination"; (2) did not complete the driver's evaluation; and (3) did not establish the need for a modified van and additional motorized wheelchair.  Id.  According to Marasciullo, VESID established that Wasser "may still obtain a driver's evaluation, a modified van (if he can drive) and an additional motorized wheelchair if and when he establishes a need for these items."  Id.  In addition, the Final Decision informed Wasser of his right to "seek judicial review through an action in a court of competent jurisdiction" if he disagreed with Marasciullo's decision.  Id.

In September 2001, Wasser finally underwent a driver's evaluation at the Kessler Institute.  Kessler found that Wasser "displays excellent instincts and potential for driving" and recommended that he undergo a further evaluation with a different driving system before he be allowed to drive.  Wasser, 2003 U.S. Dist. LEXIS 17496 at *20-21.  Danna Mitchell recommended an approved vendor for the evaluation and informed Wasser that he needed to complete a form testifying to his ability and intent to purchase a vehicle.  Id.  There is no indication that Wasser has completed the evaluation process.


## (2)

On October 15, 2001 Wasser filed the instant lawsuit, asking the court to review and vacate Marasciullo's decision.

Specifically, Wasser asks the court to order VESID to
(1) reimburse him for the full cost of tuition at Brooklyn Law
School; (2) purchase a van for him or reimburse him for the full
cost of a van; (3) pay the full cost of modifications to a van as
either a passenger or driving, pending the outcome of a driver's
evaluation; (4) reimburse him for the cost of courses during the
summer of 1998; (5) provide him with a back-up motorized
wheelchair; and (6) reimburse him for "professional fees" and
"transitional services"; and (7) re-open his case.

In addition to his substantive claims, Wasser alleges that
his hearing was procedurally inadequate because Marasciullo was
biased against him.  In support of his argument, Wasser submitted
a 2005 New York State Education Department decision in an
Individuals with Disabilities Education Act ("IDEA") case where
Marasciullo served as the hearing officer, which concluded that
"there was clear evidence of actual bias and/or prejudice against
petitioners."  Decision by the State Education Department State
Review Officer, Aug. 25, 2004, attached as Ex. 8 to Pl.'s Supp.
Mem. (Jun. 7, 2006).  The State Education Department found that
Marasciullo's behavior was inconsistent with Canon Three of the
Code of Judicial Conduct, which requires that a judge be
"patient, dignified and courteous to litigants, their attorneys
and others with whom a judge deals in an official capacity."
That decision also noted that two of Marasciullo's decisions,

including the decision involving Michael Wasser at issue in this case, were being appealed.

## Discussion

### (1)

### Eleventh Amendment Immunity

The 2003 opinion left open the threshold question of whether Eleventh Amendment immunity limits the court's discretion in granting appropriate relief under the Rehabilitation Act's judicial review provision. As explained in <u>Wasser I</u>, New York State's acceptance of funds under the Rehabilitation Act currently constitutes a waiver of Eleventh Amendment immunity for suits brought under the anti-discrimination statute found at Section 504 of the Rehabilitation Act. <u>See</u> 42 U.S.C. § 2000d-7(a)(1) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act [29 U.S.C. § 794] . . . ."); <u>Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn</u>, 280 F.3d 98, 113 (2d Cir. 2001) (finding that this provision "constitutes a clear expression of Congress's intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity"). However, there is no similarly clear and unequivocal language in the Rehabilitation Act or elsewhere to inform a state

that in accepting Rehabilitation Act funds it has waived immunity to money damage suits brought under the judicial review provision found within 29 U.S.C. § 722.

Courts that have addressed this issue since the 2003 opinion have disagreed about whether the clear statement of waiver found in 29 U.S.C. § 794 is sufficient to abrogate a state's Eleventh Amendment immunity in suits brought under other sections of the Rehabilitation Act.  Compare Hurst v. Texas Dep't of Assistive Rehab. Serv., 482 F.3d 809, 810 (5th Cir. 2007)(finding that the state had not waived its Eleventh Amendment immunity in the absence of a clear and unequivocal statement accompanying 29 U.S.C. § 722(c)(5)(J) conditioning the acceptance of federal funds on such a waiver), with White v. Voc. Rehab., No. Civ. 04-842-HU, 2004 U.S. Dist. LEXIS 30388, at *5 (D. Or. Dec. 20, 2004)(finding that a state's acceptance of federal Rehabilitation Act funds constitutes a waiver of sovereign immunity in suit brought under 29 U.S.C. § 722), adopted by No. CV-04-842-HU, 2005 U.S. Dist. LEXIS 44884 (D. Or. Apr. 5, 2005), aff'd on other grounds by 201 Fed. Appx. 478 (9th Cir. 2006).

This question need not be resolved, because Wasser's claims fail on the merits.  Therefore, he is not entitled to any remedy for his claims.  Accordingly, there is no need to determine whether such claims would be barred by the Eleventh Amendment.

## Section 1983 Claims

The earlier opinion instructed the parties to brief the issue of whether the private cause of action for judicial review found at § 722(c)(5)(J) of the Rehabilitation Act supplants the availability of any claims brought under 42 U.S.C. § 1983. See Wasser I at *51-52. This cause of action was created by Congress in 1998, and so was available at the time that Wasser sought judicial review of these claims. See id. at * 37. For the reasons explained below, Wasser's § 1983 claims are preempted by the Rehabilitation Act's judicial review provision.

As recent case law has clarified, when a statute provides for a private cause of action, courts are ordinarily to infer that Congress intended to preclude an action under § 1983. See Rancho Palos Verdes v. Abrams, 544 U.S. 113, 120 (2005); Morris-Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist., 423 F.3d 153, 160 (2d Cir. 2005). A plaintiff may overcome this "ordinary inference that the remedy provided in the statute is exclusive" by providing "textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." Morris-Hayes, 423 F.3d at 160 (quoting Rancho Palos Verdes, 544 U.S. at 122). Wasser has failed to make this showing.

In Rancho Palos Verdes, 544 U.S. at 127, the Court examined whether an action under § 1983 was precluded by the

Telecommunications Act ("TCA"). Section 332(c)(7) of the TCA provided a private right of action to "any person adversely affected by a final action or failure to act by a State," which had to commence "within 30 days after such action or failure to act." _Id._ at 116. The Court reasoned that "[t]he existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which we have held that an action would lie for § 1983 and those in which we have held that it would not." _Id._ at 121. The Court added that "in _all_ of the cases in which we have held that § 1983 _is_ available for violation of a federal statute, we have emphasized that the statute at issue . . . _did not_ provide a private judicial remedy (or, in most of the cases, even a private administrative remedy) for the rights violated." _Id._ (emphasis in original). Accordingly, the Court found that "[e]nforcement of § 332(c)(7) through § 1983 would distort the scheme of expedited judicial review and limited remedies created by § 332(c)(7)(B)(v). We therefore hold that the TCA -- by providing a judicial remedy different from § 1983 in § 332(c)(7) itself -- precluded resort to § 1983." _Id._ at 127.

The Second Circuit relied on _Rancho Palos Verdes_ in holding that a § 1983 action could not co-exist with the comprehensive remedial scheme of the Uniform Services Employment and Reemployment Act ("USERRA"). _See_ _Morris-Hayes_, 423 F.3d at 160-

27

61. There, an elementary school principal fired from her job in 2003 brought two claims against the superintendent of the school district and members of the Board of Education. In her § 1983 action, the plaintiff alleged that the defendants had violated the USERRA, which bars employment discrimination for military service obligations. Id. at 156. The Second Circuit held that USERRA provided for detailed "litigation options and remedies," and that this comprehensive remedial scheme would be "distorted by a § 1983 action." Id. at 161.

The Rehabilitation Act, at 29 U.S.C. § 722(c), similarly provides a comprehensive remedial scheme for individuals to challenge benefit determinations relating to their vocational rehabilitation services. The Act provides for mediation, administrative review of an agency decision, and access to support from a client assistance center. See 29 U.S.C. § 722(c)(1)-(4)). The Act also provides a private cause of action that allows a civil action to be brought "in any State court of competent jurisdiction or in a district court of the United States of competent jurisdiction without regard to the amount of controversy." 29 U.S.C. § 722(c)(5)(J)(i). The statute instructs the reviewing court to examine the administrative record and hear additional evidence. 29 U.S.C. § 722(c)(5)(J)(ii). The reviewing court is instructed to make a decision based on "the preponderance of the evidence," and "grant

such relief as the court determines to be appropriate." Id.
These detailed procedures are sufficiently comprehensive to
preclude an action under § 1983 under the analysis set forth in
Rancho Palos Verdes and Morris-Hayes.

It is instructive that courts reviewing the similar remedial
scheme provided by the IDEA, as well as § 504 of the
Rehabilitation Act, have found after Rancho Palos Verdes that
those statutes preclude an action under § 1983. See A.W. v.
Jersey City Pub. Sch., 486 F.3d 791, 802 (3d Cir. 2007)
(overturning its own precedent after Rancho Palos Verdes, and
holding that the remedial schemes for enforcing the IDEA and
§ 504 are comprehensive and preclude a § 1983 action); Blanchard
v. Morton Sch. Dist., 509 F.3d 934, 937 (9th Cir. 2007) (holding
that "the comprehensive enforcement scheme of the IDEA evidences
Congress' intent to preclude a § 1983 claim for the violation of
rights under the IDEA."); Diaz-Fonseca v. Puerto Rico, 451 F.3d
13, 29 (1st Cir. 2006) (holding that "where the underlying claim
is one of violation of the IDEA, plaintiffs may not use § 1983
. . . in an attempt to evade the limited remedial structure of
the IDEA"); Disability Rights Council of Greater Washington v.
Washington Metro Area Transit Auth., No. Civ. 04-0498, 2006 U.S.
Dist. LEXIS 90313 at *41 (D.D.C. Dec. 9, 2006) (holding that the
Rehabilitation Act's remedial scheme to enforce § 504 precludes
an enforcement action under § 1983).

In short, the private right of action in § 722(c)(5)(J) is part of a comprehensive remedial scheme that creates an ordinary inference that this statute provides an exclusive remedy. Wasser has not overcome this inference through any evidence, explicit or implicit, that this statute should complement, rather than supplant, an action under § 1983. Accordingly, Wasser may not use § 1983 to seek enforcement of his rights under § 722 of the Rehabilitation Act, and his § 1983 claims must be dismissed.

## (3)

## Procedural Claims

**a. Wasser's Procedural Rights are Defined by the Rehabilitation Act and Implementing Regulations.**

The Rehabilitation Act and its implementing regulations create certain procedural requirements and protections. The Sixth Circuit, reviewing claims brought by a vocational services recipient under § 722(c)(5)(J) in <u>Diamond v. Michigan</u>, 431 F.3d 262 (6th Cir. 2005), concluded that such claims should be reviewed through the two step analysis used under the IDEA. <u>See</u> <u>Diamond</u>, 431 F.3d at 266 (citing <u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 206-07 (1982)). First, a reviewing court must determine whether the state followed the procedures required by the Rehabilitation Act. <u>Id.</u> Second, the court must determine whether the individualized vocational rehabilitation program is reasonably calculated to provide vocational benefits. <u>Id.</u> "If

the court finds that the state met both requirements, then the
state has complied with the obligations required by Congress
under [the Rehabilitation Act], and the court can require no
more." Id. Moreover, a plaintiff is only entitled to relief for
a procedural violation if the plaintiff can show that this
procedural violation caused a substantive harm. Id.; Matrejek v.
Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 (S.D.N.Y.
2007) (stating that under the IDEA "[o]nly procedural
inadequacies that cause substan[tive] harm" merit relief).

Wasser argues that his procedural rights are also protected
by the Due Process Clause of the Fourteenth Amendment. Social
welfare benefits receive constitutional protection "as a species
of property protected by the federal Due Process Clause." Kapps
v. Wing, 404 F.3d 105, 113 (2d Cir. 2005) (citing Goldberg v.
Kelly, 397 U.S. 254, 262 & n.8 (1970)). But it is well settled
that a mere "unilateral expectation" of receiving a benefit is
not enough for constitutional protections to attach. Id. "[A]
property interest arises only where one has a 'legitimate claim
of entitlement' to the benefit." Id. (citing Board of Regents of
State Colleges v. Roth, 408 U.S. 564, 577 (1972)).

It is doubtful that Wasser's right to vocational services
rises to the level of a constitutionally protected "entitlement."
See Jackie S. v. Connelly, No. 2:05-CV-755, 2007 U.S. Dist. LEXIS
58289, at *23 (S.D. Ohio Aug. 9, 2007) (finding that denial of

vocational benefits under the Rehabilitation Act failed to state
a Fourteenth Amendment due process claim).  The Rehabilitation
Act, when setting forth eligibility requirements for vocational
services, specifically states that nothing in that section of the
Act "shall be construed to create an entitlement to any
vocational rehabilitation service."  29 U.S.C. § 722(a)(3)(B).
The New York State Court of Appeals, in its analysis of VESID's
obligations under the Rehabilitation Act, has found that VESID
has final authority over the contents of a beneficiary's IWRP, in
part because VESID must retain discretion to ensure an
appropriate disbursement of limited funds among its clients.  See
Murphy v. VESID, 92 N.Y.2d 477, 488, 683 N.Y.S.2d 139, 144, 705
N.E.2d 1180, 1185 (1998).  This statutory and regulatory scheme
gives significant discretion to VESID, and thus prevents Wasser's
rights to vocational benefits from rising to the level of a
constitutionally-protected "entitlement."  See Sealed v. Sealed,
332 F.3d 51, 56 (2d Cir. 2003); Kelly Kare, Ltd. v. O'Rourke, 930
F.2d 170, 175 (2d Cir. 1991) ("If the statute, regulation, or
contract in issue vests in the state significant discretion over
the . . . conferral of [a] benefit, it will be the rare case that
the recipient will be able to establish an entitlement to that
benefit.").

Even assuming that Wasser had a constitutional right to due
process, however, the procedures set forth in the Rehabilitation

Act and corresponding regulations are plainly sufficient to protect his procedural rights.  <u>See</u> <u>Reaves v. Missouri Dep't of Elementary and Secondary Educ.</u>, 422 F.3d 675, 682 (8th Cir. 2005) (finding that vocational services hearing complied with procedural requirements of the Rehabilitation Act and implementing regulations, and that these protections were sufficient to satisfy constitutional due process requirements); <u>Does v. Mills</u>, No. 04 Civ. 2919, 2005 U.S. Dist. LEXIS 6603, at *26-28 (S.D.N.Y. Apr. 19, 2005) (finding that the similar hearing rights provided by the IDEA and implementing regulations satisfied the constitutional requirements for procedural due process).  Accordingly, the relevant issue remains whether VESID complied with the procedural requirements of the Rehabilitation Act and its implementing regulations.

As explained below, Wasser has failed to show that he was denied any of the procedural protections required by the Rehabilitation Act.  In any event, as explained in the following section, there would be no remedy available for any of Wasser's procedural claims, because he has failed to show that any of these alleged procedural violations caused substantive harm.

**b.    Wasser's Hearing Provided Adequate Protection of His Procedural Rights.**

Contrary to Wasser's contentions, VESID provided Wasser with significant procedural protections.  VESID clearly provided Wasser with adequate notice of the various avenues available to

33

pursue his complaints, including mediation and a due process
hearing.  In conformity with the applicable regulations, Wasser
was notified on several occasions of his "right to obtain review
of State unit determinations that affect the provision of
vocational rehabilitation services through an impartial due
process hearing."  See 34 C.F.R. § 361.57(b)(1); see also 8
N.Y.C.R.R. § 247.2; Closure Letter; Wasser Decl. Ex. 71; Wasser
Decl. Ex. 72; Wasser Decl. Ex. 76.  VESID also notified Wasser
when it scheduled his impartial hearing of Wasser's "right to
present relevant evidence and to have representation."  Letter
from William A. Carpenter to M. Wasser (Sept. 29, 2000),
submitted as H.O. Ex. 2.  In addition, VESID provided Wasser a
brochure describing the Client Assistance Program, id., pursuant
to its obligation to do so under federal and state regulations.
See 34 C.F.R. § 361.57(b)(1)(v); 8 N.Y.C.R.R. § 247.2(d)(1).

    Despite Wasser's contention that Marasciullo "set arbitrary
and unreasonable limits on what evidence [he] could present, what
arguments [he] could make, and whether [he] could receive
physical assistance in presenting [his] case," Pl.'s Supp. Mem.
at 10, the hearing itself complied with controlling laws and
regulations.  Marasciullo was "randomly selected in accordance
with" federal laws and regulations as well as VESID policy, which
mandate that hearing officers be randomly selected from a list of
qualified individuals maintained by VESID.  See 29 U.S.C.

34

§ 722(c)(5)(A)-(C); 34 C.F.R. § 361.57(f); VESID Policy 105.00.
During the hearing, Wasser had "an opportunity to submit
. . . evidence and other information" in support of his position.
34 C.F.R. § 361.57(b)(3); 8 N.Y.C.R.R. § 247.2.  Wasser also had
the opportunity to "confront and cross-examine adverse
witnesses," 8 N.Y.C.R.R. § 247.4; <u>see</u> <u>also</u> Jan. 8, 2001 Tr. at
49-190 (Wasser cross-examination of Danna Mitchell).
Marasciullo, as the hearing officer, had the power under state
regulations to "define the issues raised by the parties, receive
and consider all relevant and reliable evidence, [and ensure] an
orderly presentation of the evidence and issues."  8 N.Y.C.R.R. §
247.4.

Wasser argues that Marasciullo's psychology license, issued
by the State Education Department which also oversees VESID,
gives rise to a conflict of interest.  However, this is not
supported by the Rehabilitation Act or state and federal
regulations, which specifically define the circumstances that
support a disqualifying conflict of interest.  For example, a
hearing officer would have a conflict of interest if he was an
employee of a public agency, had been involved in the applicant's
vocational rehabilitation or has a personal or financial interest
that would conflict with his objectivity.  <u>See</u> 29 U.S.C.
§ 705(16); 34 C.F.R. § 361.5(b)(25); 8 N.Y.C.R.R. § 247.1(f).
The fact that the New York State Education Department issued

35

Marasciullo's license and also oversees VESID is too attenuated a connection to create a "personal, professional, or financial interest" that would call Marasciullo's objectivity into question.

Wasser also argues that Marasciullo's final decision was "meritless" and "contrary to law." State regulations mandate that a final decision "be a comprehensive statement by the hearing officer," including a statement of the issues, facts as supported by evidence, reference to laws and regulations, conclusions, and actions to be taken in order to implement the recommendation in the final decision. 8 N.Y.C.R.R. § 247.4 (l). Wasser claims that Marasciullo failed to cite laws and regulations, provide a basis for his conclusions or a statement of facts, or understand the underlying basis for VESID services, and that "[i]f Marasciullo did not understand the purpose for which VESID exists, he cannot be considered capable of rendering a decision as to the appropriateness of services provided or decisions made." Wasser Decl. at ¶ 82. In fact, Marasciullo's final decision, though not lengthy, included a recitation of both Wasser's and VESID's positions, as well as findings of fact and the basis for Marasciullo's conclusion. See Klekman Aff. Ex. D. Importantly, the final decision reiterated that Wasser "may still obtain a driver's evaluation, a modified van (if he can drive)

and an additional motorized wheel chair if and when he establishes a need for these items." Id.

As to the finding of default, Wasser contends that he failed to appear at the final hearing session scheduled for July 18, 2001 because Marasciullo unreasonably refused to grant Wasser's postponement request, which he needed due to a medical appointment. Wasser Decl. at ¶ 83-85. New York State regulations allow a hearing officer to hold a party in default for "failure to appear or to give notice of an inability to appear at a scheduled hearing," and further that such a finding of default "shall be deemed a waiver of the right to a hearing, unless the individual applies [for relief] promptly to the hearing officer." 8 N.Y.C.R.R. § 247.4(e). The hearing officer is directed to grant relief from default if the individual presents "documentation of the reasons for the individual's failure to appear . . . [and] if the individual establishes good cause for such failure." Id.

Though Wasser requested a postponement in advance of the July 18, 2001 hearing session citing medical necessity, he did not provide supporting documentation for his need until July 24, 2001. See H.O. Ex. 35; H.O. Ex. 34; H.O. Ex. 36; Wasser Decl. Ex. 49. As such, Marasciullo's initial finding of default on July 18, 2001, when Wasser failed to appear at the hearing after his postponement request had been denied, was proper. However,

Wasser did provide timely documentation of his inability to appear after the fact, and Marasciullo's failure to grant relief from default was inappropriate.  Given that Marasciullo nevertheless reached the merits of Wasser's case in his final decision, and because the existing record was adequate to support his ruling, there is no remedy for any procedural claims that Wasser might have based on Marasciullo's finding of default.

Finally, Wasser complains that Marasciullo was biased against him.  The record illustrates an unfortunate level of animosity between Marasciullo and the Wasser family. Nonetheless, even assuming that Marasciullo failed to be an impartial hearing officer, any prejudice suffered by Wasser would be mooted by this proceeding.  Wasser has had a full opportunity to supplement the record from his due process hearing with additional evidence.  An independent judicial review of this extensive evidentiary record supports all of VESID's benefit decisions.  Because judicial review of the record effectively renders Marasciullo's decision moot, there is no additional remedy that would be available to Wasser, even if he could show that Marasciullo lacked impartiality.  See D.B. v. Ocean Twp. Bd. of Educ., 985 F. Supp. 457, 540 (D.N.J. 1997); Logue v. Shawnee Mission Pub. Sch. Unified Sch. Dist. No. 512, 959 F. Supp. 1338, 1343-44 (D. Kan. 1997).

In sum, Wasser has failed to demonstrate that VESID failed
to afford him adequate procedural protections.  Wasser's hearing
complied with VESID procedures, which in turn conform with state
and federal laws and regulations.  Wasser was informed of, had
access to, and indeed availed himself of a multi-level agency
review process to challenge VESID's denial of benefits.  Although
Wasser was unhappy with the outcome of his impartial hearing --
the highest level of review within the agency -- he was duly
informed of and provided with the opportunity to challenge the
result of his hearing in federal court pursuant to his right to
do so under the Rehabilitation Act.  As such, Wasser's procedural
claims must fail.

**(4)**

**Claims Regarding Denials of Benefits**

As noted, the Rehabilitation Act provides individuals with a
private right of action to challenge the final decision issued by
a state agency's reviewing official in state or federal court.
29 U.S.C. § 722(c)(5)(J).  Under the Act, the reviewing court is
directed to review both the underlying administrative record as
well as any additional evidence at the request of either party,
and base its decision "on the preponderance of the evidence."
Id. at § 722(c)(5)(J)(ii).

As a threshold matter, the parties disagree about the
appropriate standard of review.  Wasser argues that the Act

directs the court to conduct a <u>de novo</u> review according no deference to the agency's underlying determination.  Pl.'s Supp. Mem. at 20.  Defendants contend that the hearing officer's underlying determination should be accorded "due weight."  Defs.' Corrected Supplemental Reply Mem. of Law at 10.

Courts have looked to the IDEA for guidance in interpreting the nearly-identical judicial review provision in the Rehabilitation Act.  <u>See</u> <u>Reaves v. Missouri Dep't of Elementary & Secondary Ed.</u>, 422 F.3d 675, 681 (8th Cir. 2005); <u>Diamond v. Michigan</u>, 431 F.3d 262, 265 (6th Cir. 2005).  While the Second Circuit has not yet spoken to the question of the applicable standard of review under the Rehabilitation Act, the Northern District of New York recently followed the Sixth and Eighth Circuits by importing the standard of review applicable under the IDEA.  <u>See</u> <u>Carrigan v. N.Y. State Educ. Dep't</u>, 485 F. Supp. 2d 131, 134-35 (N.D.N.Y. 2007).  Under this standard of review, courts are instructed to determine whether the agency's decision is supported by a preponderance of the evidence, while giving "due weight" to the conclusions reached in the administrative proceeding.  <u>See</u> <u>Reaves</u>, 422 F.3d at 681; <u>Diamond</u>, 431 F.3d at 265; <u>Carrigan</u>, 485 F. Supp. 2d at 134-35.

This standard of review is supported by the Second Circuit's approach to judicial review under the IDEA.  District courts conducting a review under the IDEA "must engage in an independent

review of the administrative record" while according "'substantial deference to state administrative bodies on matters of educational policy.'" Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007)(quoting Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005)). Federal courts' role in reviewing agency determinations is not "'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" Id. (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. Westchester County v. Rowley, 458 U.S. 176, 206 (1982)). Similarly, review of a VESID decision under the Rehabilitation Act should accord appropriate deference to the agency's policy views and administrative proceedings. See Carrigan, 485 F. Supp. 2d at 134. Questions of federal law, however, are to be reviewed under a de novo standard. Id. at 135.

At the conclusion of the VESID hearing, Marasciullo issued a final order that denied Wasser's claims, finding that VESID provided Wasser with "adequate services within the power and scope of their organization" and that VESID successfully assisted Wasser in reaching his employment goals. Final Decision, attached as Klekman Aff. Ex. D. In this action, Wasser asks that VESID: 1) reimburse him for the full cost of tuition at Brooklyn Law School; 2) purchase a van for him or reimburse him for the

full cost of a van; 3) pay the full cost of modifications to a van as either a passenger or driving, pending the outcome of a driver's evaluation; 4) reimburse him for the cost of courses during the summer of 1998; 5) provide him with a back-up motorized wheelchair; and 6) reimburse him for "professional fees" and "transitional services"; and 7) re-open his case.  For the reasons that follow, these requests are denied.[4]

### i.    Tuition Reimbursement

First, Wasser requests that VESID reimburse him for the full cost of tuition at Brooklyn Law School.  VESID Policy 405.00, which describes agency policy with regard to the cost of higher education, provides that tuition reimbursement may not exceed the cost of the least expensive public institution in New York offering an academic program necessary to achieve the student's vocational goal.  This policy states that VESID may only pay for the tuition at a non-public institution if there is no such public program available in New York State.  Based on this policy, VESID reimbursed Wasser for the tuition rate at SUNY Buffalo, rather than the higher tuition costs for Brooklyn Law School.  Notably, this reimbursement rate is actually higher than the tuition costs for CUNY Law School, which was the least

---

[4] Wasser is also seeking various changes in VESID policy relating to this list of benefits.  However, as Wasser has failed to show that he is entitled to any of the benefits he seeks, there is no basis for this court to amend VESID policy on these issues.

expensive public law school available to Wasser in New York City. In 1996, the tuition at SUNY Buffalo was $3,050 per semester, see Wasser Hearing Ex. 10, compared to $2,850 per semester at CUNY, see Declaration of Franklin Siegel, dated May 26, 2005.

Wasser maintains that the policy should be waived because both SUNY Buffalo and CUNY School of Law were inappropriate for him based on his disability and career goals. According to Wasser, SUNY Buffalo was inaccessible due to the harsh climate of upstate New York, in addition to the fact that his medical condition requires the constant care of his family and doctors. Wasser argues that CUNY was inappropriate because it is academically inferior. Therefore, he claims that there was no appropriate public law school available to him when he decided to attend Brooklyn Law School.

Wasser has failed to demonstrate any valid reason why he could not have attended CUNY School of Law, which VESID would have fully reimbursed. Wasser has not alleged that CUNY would have been inaccessible to a student with his disabilities. Although Wasser has cited the "receptive" atmosphere at Brooklyn Law School as a basis for his decision to attend, see Wasser Decl. ¶ 27, he has not shown that Brooklyn Law School offered supportive services that were unavailable at a public law school. Wasser's belief that CUNY School of Law was academically inferior does not require VESID to waive its otherwise valid policy. CUNY

43

School of Law is located in reasonable proximity to his home. It was fully accredited by the American Bar Association at the time Wasser attended law school. Graduates of CUNY are employed in a wide variety of settings including the New York City Law Department where Wasser has worked since graduating from law school in 1999. This evidence shows that CUNY would have provided an acceptable educational option for Wasser.

Certainly it is within Wasser's discretion to choose to attend a private law school. However, it is also appropriate for VESID to reimburse tuition rates only up to the cost of a public institution. This policy accords with VESID's obligation to "appropriately factor in the cost of providing services," so that it may use its limited resources to provide benefits to the maximum number of clients. Murphy v. VESID, 92 N.Y.2d 477, 487, 683 N.Y.S.2d 139, 144, 705 N.E.2d 1180, 1185 (1998). See also Fogel v. Perales, 135 A.D.2d 884, 886, 522 N.Y.S.2d 283, 284 (3d Dep't 1987) (finding that partial reimbursement for private law school tuition is permissible under the Rehabilitation Act). VESID's preference for public over private schooling is comparable to its preference for in-state over out-of-state services, which is expressly allowed under federal regulations in order to keep down rehabilitation costs. See 34 C.F.R. § 361.50(b)(1) ("The State unit may establish a preference for

in-State services, provided that the preference does not effectively deny an individual a necessary service.")

Accordingly, Wasser is not entitled to full reimbursement for his tuition at Brooklyn Law School.

### ii. Vehicle Purchase

Second, Wasser requests that VESID either purchase a van for him, pending the outcome of his driver's evaluation and training, or reimburse him for the full cost of the van if it must be purchased in advance in order to complete the evaluation and training. In support of his argument, Wasser contends that a base vehicle constitutes "rehabilitation technology" within the meaning of the Rehabilitation Act, and thus that VESID is required to provide it. However, federal regulations make clear that "[t]he purchase and repair of vehicles, including vans" is a transportation service, whereas only vehicle "modification would be considered a rehabilitation technology service." 34 C.F.R. § 361.5(b)(57)(i).

VESID policy explicitly states that it does not pay for base vehicles. See VESID Policy 441.00.[5] Moreover, VESID maintains that while the Rehabilitation Act authorizes payment for transportation services in order to achieve the employment outcome listed on an individual's IWRP, the statute does not

---

[5] VESID Policy 441.00, entitled Vehicle Modifications, Adaptive and Automotive Equipment Policy, states that "VESID does not purchase vehicles."

45

require VESID to provide transportation to and from work once that outcome is achieved and an individual's case is closed.

Applicable regulations and policy indicate that payment for "transportation services" is meant to assist an individual in achieving an employment outcome, and VESID policy does not contemplate the continuation of transportation services once an employment outcome has been achieved. VESID Policy 1355.00 (on transportation services) explicitly warns that because "VESID cannot pay for transportation once a consumer's case is closed, a consumer's prospective feasability to get to and from work will influence that consumer's feasability to benefit from vocational rehabilitation services." This policy meets the requirements of federal statute and regulation. <u>See</u> 29 U.S.C. § 723(a)(8) (defining vocational rehabilitation services to include "transportation . . . that is provided in connection with the provision of any other service described in this section and needed by the individual <u>to achieve an employment outcome</u>" (emphasis added)); 34 C.F.R. § 361.48(h) (providing for transportation "in connection with the rendering of any vocational rehabilitation service").

In short, VESID may properly maintain its policy that it does not purchase base vehicles. It may also provide transportation only in connection with rehabilitation services provided pursuant to an IWRP, and to cease provision thereof once

46

an individual obtains his or her employment goal.  Accordingly, this claim is denied.

### iii. Vehicle Modifications

Third, Wasser requests that VESID pay for the full cost of modifications to a van so that he can use it as either a passenger or a driver, pending the outcome of a driver's evaluation.  VESID has consistently stated that it is willing to provide a driver's evaluation through Post Employment Services, and that the question of modifications is premature until Wasser completes that evaluation.  Indeed, VESID policy states that it will approve vehicle modifications only pursuant to a written recommendation from a "Driver Rehabilitation Specialist" indicating the specific equipment required based on an individual's disability.  See VESID Policy 441.00.  Such assessment takes place during a driver's evaluation and training. See id.

It is well within VESID's discretion to require an evaluation prior to approving vehicle modifications.  Because VESID has consistently stated that it is willing to provide a driver's evaluation for Wasser, it is entirely reasonable to expect Wasser to undergo this evaluation, at which time VESID may determine what modifications are required.  Thus, because Wasser has yet to complete an evaluation so that VESID can determine the

extent to which his vehicle needs to be modified, it is premature at this time to order VESID to pay for vehicle modifications.

### iv. Summer Tuition Reimbursement

Fourth, Wasser requests that VESID reimburse him for the cost of his activities during the summer of 1998, which he describes as an internship with the New York Law Department and a Trial Advocacy class. VESID refused to pay this cost based on its existing policy for summer school courses. VESID will only pay for the cost of a summer session if an individual can document that it is necessary either to advance the date to complete a program; to enable an individual to take required or sequential courses that would otherwise be unavailable; to enable an individual to retake a course failed during the semester or otherwise necessary to complete the program according to the agreed upon target date; or to meet the needs of an individual "whose disability restricts the number of credits to be undertaken per semester." VESID Policy 405.00. This policy is plainly based on VESID's efforts to contain costs by minimizing the number of semesters it reimburses for each of its clients. Wasser was aware of this policy in 1998, and in fact VESID had already denied a similar request for reimbursement for a summer course and internship from the summer of 1997. As already noted, such cost-containment measures are within VESID's authority. See Murphy v. VESID, 92 N.Y.2d 477, 488, 683 N.Y.S.2d 139, 144, 705

48

N.E.2d 1180, 1185 (1998).  <u>See also</u> <u>Carrigan v. N.Y. State Educ.</u>
<u>Dep't</u>, 485 F. Supp. 2d 131, 139-40 (N.D.N.Y. 2007) (finding that
VESID may consider cost when determining the services to be
provided to disabled individuals).

Wasser's strongest argument for reimbursement of his summer
fees and tuition is his claim that he would not have been able to
graduate law school in three years if he had not taken summer
courses.  Wasser Decl. ¶ 65.  As evidence he submits a November
20, 1997 letter sent by his physician to VESID.  In this letter,
Dr. Dora H. Schively, M.D., director of the Neuromuscular Disease
Center at New York University Medical Center, refers to prior
conversations with VESID regarding the limitations caused by
Wasser's muscular dystrophy, and states that Wasser "must manage
his time wisely to protect his health and to preserve his
strength.  I strongly recommend that he take summer courses to
lighten his work load during the remainder of the school year."
Letter from Dr. Dora H. Schively to Danna Mitchell, dated Nov.
20, 1997, attached as Wasser Hearing Ex. 9.

This recommendation could have permitted VESID to use its
discretion to pay for Wasser's summer classes.  Nonetheless,
VESID has made clear that it will only pay for summer courses
when absolutely necessary, in the interest of fiscal prudence.
<u>See</u> Klekman Aff. Ex. B.  Wasser's success in completing his first
year of law school while on a full-time schedule supports VESID's

assessment that he could complete his law degree on time without additional summer credits. There is no evidence, other than this doctor's recommendation, that Wasser's disability rendered him unable to tackle a full law school courseload. Therefore, Wasser cannot show by a preponderance of the evidence that his summer courses were necessary because his disability would otherwise have rendered him unable to graduate law school on time.

Wasser's internship with the New York City Law Department in the summer of 1998 clearly aided his career goals, as it led to a job upon graduation. Wasser Decl. ¶ 62. It would certainly behoove VESID to support such activities, which provide significant benefits and represent only a small fraction of the costs of Wasser's rehabilitation. Nonetheless, giving due weight to VESID's policy recommendations, the record is sufficient to support VESID's decision to deny these payments based on its summer school policy. Therefore, Wasser's claim for reimbursement for the summer of 1998 is denied.

### v.   Back-Up Motorized Wheelchair

Fifth, Wasser requests that VESID provide him with a back-up motorized wheelchair. Wasser is completely dependent on his wheelchair, and has explained that unexpected absences from work due to necessary repairs are detrimental to his career. It is Wasser's position that VESID is responsible for providing these kinds of services, and further that VESID is aware of the extent

to which Wasser relies on his wheelchair.  As such, Wasser maintains that VESID should provide him with a spare without regard to economic need.

VESID, however, does not routinely provide spare motorized wheelchairs.  Wasser has failed to provide any legal or factual support for his claim that he is entitled to a spare wheelchair. Wasser's concerns about access to an effective and functioning wheelchair are certainly well-taken.  <u>See</u> Wasser Decl. ¶ 71. However, as he himself points out, his "wheelchair is not an ordinary, off the shelf, motorized wheelchair," but an "expensive" customized piece of equipment.  <u>Id.</u>  VESID rightly argues that the goals of the Rehabilitation Act "cannot be accomplished if an agency has to supply duplicative equipment to one consumer at the expense of denying basic equipment to another consumer."  Defs.' Supp. Mem. at 28.  Accordingly, this request is denied.

### vi.  Other Fees

Sixth, Wasser requests that VESID reimburse him for "professional fees," such as those he paid for the bar exam. According to VESID, Wasser never formally requested payment or reimbursement for these.  The fees for which he did request payment, such as for a BarBri bar review course, were authorized and paid by VESID.  Similarly, Wasser requests reimbursement for "transitional services."  Again, VESID maintains that Wasser

never formally requested reimbursement for transitional services and further that the request is ambiguous, though VESID interpreted "transitional services" to mean transportation. Wasser has provided no additional evidence to show that he was denied payment for appropriately requested fees. Accordingly, this claim is also denied.

### vii. Case Closure

Finally, Wasser demands that VESID reopen his case. Wasser maintains that because VESID closed his case before he was admitted to practice law in New York State, and because he does not have the ability to travel independently for work, he has not achieved a satisfactory employment outcome. Further, Wasser complains that VESID closed his case without consulting or meeting with him, and that it cancelled the authorization for his driver's evaluation and training when it closed his case.

As an initial matter, though VESID cancelled the existing authorization for the driver's evaluation at the Kessler Institute when it closed his case, VESID also informed him in his case closure letter that it would provide the same evaluation through Post Employment Services and it notified him of the process for setting up such an evaluation. While VESID may not terminate services when it closes an individual's case pending administrative or judicial review, it is within VESID's

discretion to provide identical services through different branches of the agency.  As such, that VESID cancelled the existing authorization for the driver's evaluation and at the same time provided information on how to obtain the same exact driver's evaluation through Post Employment Services does not violate VESID policy or applicable state and federal laws and regulations.

With respect to applicable policy and regulations for case closure, federal regulations permit a case to be closed only if the individual achieved the employment outcome described in the IWRP; the individual has maintained employment for a minimum of ninety days; both the case counselor and the individual agree that the employment outcome is satisfactory; and the individual is informed of post-employment services "through appropriate modes of communication."  34 C.F.R. § 361.56.  VESID policy elaborates on the federal regulations, and permits case closure only when the employment outcome on that individual's IWRP has been achieved, as determined according to the satisfaction of certain criteria.  VESID Policy 010.00 states that an employment outcome is "achieved" when the individual is employed in a position consistent with the goal listed on the IWRP; the services provided pursuant to the IWRP contributed to the achievement of the employment goal; the agency has received

verification that the individual is paid at or above minimum wage and at an equal wage and benefit level compared to non-disabled coworkers; the individual is employed a minimum of ninety days; VESID and the individual agree that the employment outcome is "satisfactory" and that the individual is "performing well"; and the individual is informed of post-employment services.

A preponderance of the evidence shows that all of these requirements had been met when VESID closed Wasser's case in March 2001. Although VESID failed to consult Wasser personally prior to closure, it nonetheless did not act outside applicable regulations and policy. Wasser listed "corporate lawyer" as his employment objective on his IWRP. VESID paid for him to attend college, partially funded his law school tuition and provided him a wide variety of services throughout his relationship with the agency to assist him in meeting his career objective. Wasser passed the New York state bar examination and was hired as an attorney at the New York City Law Department where he continues to work. Wasser notified VESID of his employment and stated that he was "extremely satisfied" in his position. VESID obtained verification of his wage. While VESID closed Wasser's case before he was technically admitted to practice in New York, VESID reasonably understood Wasser's passing the bar to be indistinguishable from being admitted to practice. Moreover,

Danna Mitchell provided Wasser with the requisite information on post-employment services when she closed his case. Although Mitchell failed to meet with Wasser personally before closing his case, this is excusable in light of the animosity expressed by Wasser toward VESID, and toward Mitchell personally, when Mitchell inquired about his new employment. See Wasser Hearing Ex. 1.

VESID policy and federal regulations require, before an agency may close a case, that the IWRP employment goal be met and that both the individual and agency agree that the outcome is satisfactory. That Wasser desired to keep his case open does not make the agency's decision to close the case without his agreement unreasonable in light of the record, which clearly shows that Wasser had fulfilled the objectives of his IWRP. Accordingly, VESID was entitled to close this case, and Wasser is not entitled to have it reopened.

## Conclusion

In short, VESID's benefit decisions are supported by a preponderance of the evidence. Wasser has failed to show that his procedural rights were violated. In any event, the record shows that VESID provided adequate vocational rehabilitation services to permit Wasser to meet the goals of his IWRP and

become an attorney.  Accordingly, there would be no remedy for any procedural violations because Wasser has failed to show that he was substantively harmed.  Therefore, all of plaintiff's claims are dismissed.

The Clerk of the Court is instructed to close the case.


Dated:  Brooklyn, New York
        August 27, 2008


                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge